IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CRICKET LG PHONE, IMEI 354660115983127-11; BLACK SAMSUNG PHONE, IMEI: 357177100084321; and WHITE SAMSUNG PHONE, IMEI: 352387282822720--CURRENTLY LOCATED AT 1024 CAPITAL DRIVE, FRANKFORT, KY 40601 | Case No. 5:23-MJ-5142-MAS |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Stanley Williams, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—three electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a University of Kentucky Police Department ("UKPD") employee and Task Force Officer ("TFO") assigned to the FBI Child Exploitation and Human Trafficking Task Force and have been since January 2020. I am authorized to investigate violations of federal law and to apply for and execute warrants issued under the authority of the United States. I am sworn to investigate federal crimes that apply to Child Pornography and Child Exploitation. Prior to becoming a TFO, I worked as a patrol officer with UKPD, investigating various state crimes that occurred on the University of Kentucky's campus in Lexington, Kentucky, including crimes of a

sexually violent nature. Since becoming a TFO, I have reviewed training material, attended training sessions, and discussed investigative techniques pertaining to child sexual abuse material, sextortion, and child exploitation. I have been certified by the FBI in being an Online Covert Employee, which allows me to conduct online investigations and communicate with individuals who possess, distribute, and produce child sexual abuse material as well as individuals who seek to meet with or transport minors for sex.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all knowledge about this matter.

4.      I am investigating the criminal activities of Jonathan Fitzgerald Cannada ("Cannada"). Based upon the information obtained in the investigation and as set forth below, I submit that probable cause supports that Cannada used a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a); enticed a minor to engage in prohibited sexual activity in violation of 18 U.S.C. § 2422(b); received child pornography in violation of 18 U.S.C. § 2252(a)(2); and transferred obscene material to a minor in violation of 18 U.S.C. § 1470; and that evidence of these crimes exists on the three electronic devices that are the subject of this affidavit.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched includes:

    a.   Cricket LG IMEI 354660115983127-11;

     b.   Black Samsung IMEI: 357177100084321; and

     c.   White Samsung IMEI: 352387282822720.

6.     Collectively, these three phones are referred to herein as the "Devices."

7.     The Devices are all in law enforcement custody at 1024 Capital Center Drive, Frankfort, KY 40601. Each of the Devices was manufactured outside of Kentucky.

8.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## STATUTORY AUTHORITY

9.     This investigation concerns alleged violations of Title 18, United States Code, §§ 2251(a) and (e), 2422(b), 2252(a)(2) and 1470, relating to material involving the sexual exploitation of minors:

     a.   18 U.S.C. § 2251(a) prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

     b.   18 U.S.C. § 2251(a) and (e) prohibit a person from attempting to employ, use, persuade, induce, entice, or coerce any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

     c.   18 U.S.C. § 2422(b) prohibits a person from using the mail or a means or facility of interstate commerce to knowingly persuade, induce, entice, or coerce a minor to engage in any sexual activity for which any person can be charged with a criminal offense.

3

d.  18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or that has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if (i) the producing of such visual depiction involves the use of a minor engaged in sexually explicit conduct; and (ii) such visual depiction is of such conduct.

e.  18 U.S.C. § 1470 prohibits a person from using a means of interstate commerce to send or attempt to send an obscene matter to another individual who has not attained the age of 16 years.

## **DEFINITIONS**

10.   The following definitions apply to this Affidavit and its Attachments:

a.  The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years. At times, this affidavit and its attachments may also refer to a minor or minors as "child" or "children," respectively.

b.  The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic areas of any person.

c.  The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d.  The term "computer," as defined in 18 U.S.C. §1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

4

e.  "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.

f.  "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.  "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.  "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.  "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or passphrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j.  "Digital camera" can be a standalone camera or be embedded into a smartphone. This device records pictures as digital picture files, rather than

5

by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

k. "GPS" is a navigation device that uses the Global Positioning System (generally abbreviated "GPS") to display its current location. A GPS can either be a standalone device or it can be embedded into a smartphone. It often contains records of the locations where it has been. Some GPS navigation devices can give a user directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

l. The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. This is also referred to as child sexual abuse material.

m. "Child sexual abuse material," as used herein, refers to child pornography, as defined by 18 U.S.C. § 2256(8). The FBI refers to child pornography as "child sexual abuse material" or "child exploitation material" because these

6

terms most accurately reflect the sexual abuse and exploitation experienced by child victims.

n. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means. Because this search warrant application relates to a smartphone, such records, documents, and materials should primarily refer to electronic information or data on the Devices or any associated storage mediums.

o. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

p. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

q. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are listed in one of two formats: "IPv4", which is the older version of IP addresses, and IPv6, which is the newer version of IP addresses.

r. "Domain names" are common, easy to remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period.

s. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

t.   The term "Social Networking Site" is used to describe applications or websites which focus on establishing networks or relationships among individual users based on interests or activities. Such sites include social media applications or websites, instant messaging applications or websites, dating applications or websites, online forums or message boards, and chat rooms. Social Networking Sites operate via the internet.

u.   "Facebook Messenger" is related to Facebook, a Social Networking Site. Facebook Messenger allows users to send text messages, engage in video or audio calls, and send pictures or videos. Facebook Messenger also allows users to unsend messages or media after delivery, which effectively removes the message or video from the conversation. Facebook Messenger can be accessed via a mobile application or website operates via the internet.

v.   "Smartphone" means a combination of a mobile phone / cellphone and a handheld computer that works off mobile networks and/or Wi-Fi, or a wireless connection. A smartphone can do everything a personal computer can do, and because of its mobility, sometimes more. A smartphone is a mobile phone with highly advanced features. A typical smartphone has a high-resolution touch screen display, Wi-Fi connectivity, Web browsing capabilities, and the ability to accept sophisticated applications. Most of these devices run on two popular mobile operating systems, Android or iOS. Almost all smartphones now run on processors with high processing speeds coupled with low power consumptions. That means they allow you to play games, browse the Web, update your social media accounts (i.e., Facebook, Instagram, Twitter), make phone calls, send/receive text messages, take pictures, make videos, and even compose word documents directly on the device. A smartphone is always generally with reach. Like with a traditional computer, smartphones have the ability to download and run hundreds of thousands of mobile applications.

w.   "Tablet" means a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

x. "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

y. "Mobile device" refers to a piece of portable electronic equipment that can connect to the internet and/or store data. Common examples include wireless telephones, smartphones, tablets, laptops, and portable media players.

z. "Electronic storage medium," as used herein, refers to any item capable of electronic storage, including but not limited to computers, computer hardware, digital cameras, mobile devices, CDs, DVDs, SD cards, memory sticks, etc.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO PRODUCE OR RECEIVE CSAM

11. Based on my previous investigative experience related to child sexual abuse material investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce and receive child pornography or use the internet or Social Networking Sites to entice or coerce minors to provide child sexual abuse material:

a. Individuals who receive or produce child sexual abuse material may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from

literature describing such activity.

b.    Individuals who receive or produce child sexual abuse material may collect sexually explicit or suggestive materials, in a variety of media, including photographs, digital images and videos, magazines, motion pictures, books, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts or to refresh their memories of prior sexual child abuse activities they have committed.

c.    Individuals who receive or produce child sexual abuse material almost always possess and maintain their original copies of child pornographic material, that is, their pictures and videos in the privacy and security of their home, person, vehicle, workplace, or some other secure, web-based or cloud-based, location.  Individuals who have a sexual interest in children or images of children typically retain pictures, videos, films, photographs, magazines, correspondence, books, mailing lists, and child erotica for many years. Many of these collections can be found on external media storage devices that are easily concealed in the home, a vehicle, or the workplace, away from family members or co-workers who could stumble upon the collection.  The collections may also be concealed on smartphones in hidden applications or albums, or concealed on external storage devices.

d.    Likewise, individuals who receive or produce child sexual abuse material often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer, web-based program, cloud-based program, or secure third-party application on a mobile device or computer. These collections are often maintained for several years and are kept close by. Physically they can be kept at the collector's residence, a storage building(s) or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly. Digitally they are kept on the device(s) the individual has on their person the most, or a device only they know the password to.  Many traders and collectors of child sexual abuse material will ensure their collection, or at least part of their collection, is in a location they have frequent or easy access to and maintain "eyes on" the collection at all times.  In your affiant's training and experience, collectors of child sexual abuse material will either have a location in their residence, in their personal vehicles, or at work, where they maintain their non-cloud-based collection.

e.    Individuals who receive or produce child sexual abuse material also may correspond with and/or meet others to share or trade information and materials. They rarely destroy correspondence from other child sexual abuse material distributors/collectors. They conceal such correspondence as they do their sexually explicit material. They often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual abuse material. Sometimes these lists are kept physically, but in more and

10

more cases, the lists are maintained on a mobile or electronic device, or within an application or web-based program (like a friends list on a social media application).

f.    Individuals who receive or produce child sexual abuse material also can, and will, maintain a separate mobile device for their collection, storage, and correspondence regarding child sexual abuse material.  These devices are usually kept hidden from family members, partners, and co-workers, in locations either only the collector has access to, or location others have limited access to (for example, an outbuilding, workshop, file cabinet drawer, vehicle if each member of the family has their own, or locked safe). These locations can also be storage locations for any external devices (mentioned above) that may contain a collection.

g.    Individuals who receive or produce child sexual abuse material prefer not to be without their child sexual abuse material for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

h.    Individuals who produce child pornography via the internet or in-person often engage in "grooming" with the minor child. Grooming "describe[s] a variety of behaviors that appear calculated to prepare a child for a future sexual relationship." *United States v. Fox*, 600 Fed. Appx. 414, 419 (6th Cir. 2015) (unpublished) (citations omitted). "The ultimate goal of grooming is the formation of an emotional connection with the child and the reduction of the child's inhibitions in order to prepare the child for sexual activity." *See Id.* Based on my training and experience, grooming often includes first forming a friendship with the child; showering the child with attention, compliments, pet names, and gifts; exchanging non-explicit pictures or videos; and then flirting, discussing sexual knowledge or experience, discussing sexual fantasies, exchanging sexually explicit pictures or videos, and planning in-person sexual activities. Computers and smartphones often contain evidence of grooming, because many of these conversations occur by text or instant messaging.

i.    In my experience, many offenders who produce child pornography also use coercive tactics to achieve their end goals of creating or obtaining sexually-explicit content. These coercive tactics include manipulation, threats to the minor, and threats to the minor's parents. Again, computers and smartphones often contain evidence of these coercive tactics.

12.    I believe Cannada shares many of these characteristics because—as discussed in greater detail below—Cannada befriended Victim K and her family; engaged in sex with Victim K; took pictures of himself engaging in sexual activities with her; provided her with a secret phone; engaged in hundreds of pages of chats with her; sent pictures of his penis to her;

requested that she create and send sexually explicit images; and stored some of these photos on his cell phone. Victim A1 reported that Cannada engaged in a similar, though not identical course of conduct, with her—befriending her; sexually abusing her; providing her with a secret phone; sending pictures of his penis to her; requesting sexually explicit images of her; showing her a sexually explicit image of another minor; and threatening to harm Victim A1's mother if Victim A1 disclosed the abuse.

## BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL

13.    I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

14.    Computers and digital technology have dramatically changed the way in which individuals interested in child sexual abuse material interact with each other. Computers basically serve four functions in connection with child sexual abuse material: production, communication, distribution, and storage.

15.    In the past, technology for the transfer of child sexual abuse material images consisted of child pornographers' transferring printed photographs into a computer-readable format with a device known as a scanner. Now, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are either stored on a removable memory card in the camera, which store up to, or even over, 64 gigabytes of data, equivalent to hundreds of thousands of high-resolution photographs, or the camera is Bluetooth or Wi-Fi capable so the images can be transferred directly to another device, or directly into a

social media account on the internet.  Video camcorders, which once recorded video onto tapes or mini-CDs, are now just video cameras that can save video footage in a digital format directly to a hard drive embedded in the camera, or onto a transferable media storage device like a SD card. Some video cameras now even have Bluetooth or Wi-Fi capabilities so they can transfer the image directly to another device, or directly into a social media account on the internet.  For the old camcorders, the video files can be easily transferred from the camcorder to a computer via a cable that comes with the camcorder.  Now, all smartphones come with a digital camera embedded into the device itself.  The resolution on some of the embedded cameras on smartphones can be of a higher resolution than portable digital cameras.  The digital camera embedded in a smartphone can save the image directly onto the device, into a specific folder on the device, to a third-party application installed on the smartphone, to a media storage card inserted into the smartphone, or the image can be directed to transmit to an external device via wireless or Bluetooth connectivity between the smartphone and the selected external device.

16.     A device known as a modem allows any computer to connect to another computer through a telephone, cable, or wireless connection (Wi-Fi).  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child sexual abuse material easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child sexual abuse material.  Child sexual abuse material can be transferred via electronic mail, through file transfer protocols (FTPs), through Peer-to Peer software, and through social media applications, to anyone with access to a computer, laptop, tablet, smartphone, and a modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging", "Direct Messaging", cloud-based messaging services, etc.), social media

13

sites, free applications for smartphones and tablets, all with easy access to the Internet, the computer, laptop, tablet, and smartphone is a preferred method of production, distribution, and receipt of child sexual abuse materials.

17.     The computer's, laptop's, tablet's, and smartphone's ability to store images in digital form makes these devices themselves an ideal repository for child sexual abuse material. The size of the electronic storage media (commonly referred to as the hard drive) used in all forms of electronics has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One, two, and even four-Terabyte external and internal hard drives are not uncommon in today's computers and laptops.  Other media storage devices include CDs, DVDs, "thumb," "jump," or "flash" drives, and external hard drives, which are very small devices that are plugged into a port on the computer, smartphone, laptop, or tablet.  It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, smartphone, laptop, and tablet, and then copy it (or any other files on the device) to any one of those media storage devices. Media storage devices are constantly being made smaller and smaller in size, and also being made to look like everyday items, that they can easily be concealed and carried on an individual's person (like on a key ring, in a purse or wallet, or on a belt buckle).

18.     The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion, including the traditional "Web" and the "Dark Web" or Tor browsers.

19.     Individuals also use online resources to retrieve and store child sexual abuse material, including services offered by Internet Portals such as Yahoo!, Google, and Hotmail,

14

among others, as well as third-party cloud-based storage applications like Dropbox and Vault. The online services allow a user to set up an account with a remote computing service that provides e-mail services, direct messaging, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, laptop, tablet, or external media in most cases. All smartphones now come with the option to have the phone's data systematically updated to a provider's cloud storage. All iPhones can back up a phone's data to iCloud Storage and all Android phones can back up the phone's data to Google Cloud Storage. This automatic backup also can back up some third-party applications. But most third-party applications, once installed on a mobile device, will keep the individual's contents on one of their own servers, located elsewhere. Some third-party applications allow for special storage on the user's device through their application. While the third-party application can see there is data, the data is encrypted on the application's servers and can only be viewed on the user's device through a special portal or passcode.

20.    As is the case with most digital technology, communications by way of electronic device can be saved or stored on the device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often

maintained indefinitely until overwritten by other data.

## PROBABLE CAUSE

18.     On March 14, 2021, Witness 1 reported to Somerset Police Department ("SPD") that her daughter, Victim A1 (born in 2008), had been sexually assaulted by a family friend, Jonathan Cannada, approximately five years previous. Witness 1 learned about the assault through Victim A1's aunt. Victim A1 stayed the night with her cousin and her aunt overheard the girls discussing sex. The aunt confronted the girls and asked if anyone had ever touched them in a sexual way. Victim A1 began to cry and disclosed that Cannada had sexually assaulted her approximately 50 times over a two year period approximately five years before the disclosure.

19.     When SPD officers talked to Victim A1, she advised that the assaults typically occurred when she spent the night with Cannada's daughters at Cannada's residence on Hope Way or at Cannada's father's house at Highway 39 (both in Pulaski County). Victim A1 reported that Cannada would typically wait until everyone else went to sleep, tell Victim A1 to remove her clothes and get in bed with him, and engage in digital penetration, oral sex, and vaginal penetration with Victim A1. Victim A1 further reported that she was afraid to report Cannada because he threatened to call social services on her mother and threatened to sexually assault her siblings.

20.     On April 22, 2021, Victim A1 participated in a forensic interview at the Lake Cumberland Child Advocacy Center. The written summary of the interview indicates that Victim A1 was between the ages of four and seven when Cannada began assaulting her and that it continued until she was eleven. She recalled that it continued until she was eleven because she remembered Cannada attending her birthday party that year. Victim A1 again described various sexual acts performed on her by Cannada, stating at one point that "[Cannada] would hold me

16

down and rape me." She again reported being afraid that Cannada was going to hurt her mother and that she complied with Cannada to protect her mother. Victim A1 further reported that, at approximately age eleven, she had a pregnancy scare and that Cannada put her on pills.

21.     Detective Larry Patterson then sought to interview Cannada. In his search for Cannada, he interviewed the property owners of Cannada's last known address at 14776 Highway 39, Eubank, Kentucky. The property owners, Marty and Diana Todd, advised that Cannada no longer lived at that address. They further advised that Cannada had been living at Dewey Todd's house at 14794 Highway 39, Eubank, Kentucky. Dewey Todd is the biological father of Marty Todd and was a foster or adoptive parent to Jonathan Cannada. Marty and Diana Todd reported that they forced Cannada to leave Dewey Todd's house in April 2021 due to concerns of illegal activity, including drug use and child sexual abuse.

22.     Marty and Diana Todd advised that they had suspicions that Cannada may have abused Victim A1 and that pictures of Victim A1 could be seen on Cannada's Facebook page. However, the child sexual abuse they were referring to related to Victim K (born in 2007). The Todds advised that Victim K stayed the night with Cannada at Dewey Todd's home and that Dewey Todd had seen Victim K naked in bed with Cannada. The Todds further reported that Victim K and Cannada could regularly be seen in public together without any other individuals present. The Todds also advised that Cannada was living at Victim K's parents' house in Lincoln County, Kentucky.

23.     On July 8, 2021, Detective Patterson, along with Detective Rob Oney with Lincoln County Sheriff's Office ("LCSO") and a social worker, went to Victim K's home. Victim K's father reported that Cannada did not live with them but that he sometimes slept in the

driveway and used their bathroom to clean up. Victim K denied having any type of sexual relationship with Cannada at that time.

24.    Cannada reported for an interview at SPD later that day. Cannada claimed that he had known Witness 1's children their whole lives; that he babysat them on a regular basis; and that he had given them cell phones and tablets. Cannada denied sexual contact with Victim A1 and claimed that the allegation arose from Witness 1 being angry at him for not giving her money. Cannada also denied having a sexual relationship with Victim K. Also during this interview, Cannada advised Detective Patterson that he was planning to move to Minnesota.

25.    On August 4, 2021, Victim K's mother reported to Detective Oney that Cannada had impregnated Victim K. Detective Oney advised Detective Patterson that the sexual act occurred in Pulaski County, so Detective Patterson continued the investigation.

26.    On August 10, 2021, Victim K and her mother reported to SPD. When questioned by SPD, Victim K advised that she only had sex with Cannada once and that it was consensual. Victim K's mother provided Detective Patterson a Samsung phone that she said Cannada had purchased for Victim K, further reporting that the phone contained sexual images and messages between Victim K and Cannada. Victim K continued to minimize the situation, saying she only sent nude pictures of herself because Cannada wanted to see the "baby bump" and claiming that an up-close picture of a vagina came from the internet.

27.    With consent from Victim K's mother, Detective Patterson began looking through the phone. The text messages appeared to begin in March 2021. Detective Patterson documented

the messages below[1] relating to sex and the pregnancy in his investigative report as he reviewed them. His investigative report provides in relevant part:

04-24-2021, starting at 22:24
- ➢ Cannada- Can i stretch it
- ➢ Victim K- Yes baby you can
- ➢ Victim K - How deep can I have it
- ➢ Cannada- IDK
- ➢ Victim K - ok
- ➢ Victim K - I just want you tomorrow nude
- ➢ Cannada- OK

04-25-21, starting at 22:05
- ➢ Victim K - Will you give us a baby
- ➢ Cannada- you have to do that I can't
- ➢ Victim K- your the only one that can knock me up cause of your sperm
- ➢ Cannada- I think we already are
- ➢ Victim K - Oh god I hope so
- ➢ Victim K - I really want a baby with you.

04-26-2021 at 13:46
- ➢ Cannada- Do you feel prego netted
- ➢ Victim K- Its pregnant and yes i do
- ➢ Cannada- Sweet you feel Prego netted
- ➢ Victim K- its pregnant
- ➢ Victim K- You Happy
- ➢ Cannada- Hell yes
- ➢ Victim K- why tho
- ➢ Cannada- Something thats us
- ➢ Victim K- yea it is

04-26-21, starting at 20:41
- ➢ Victim K- They're really got me to the point of leaving really bad these days all my crap is boxed but a few clothes and a bag so I really thinking one day its not so cold.
- ➢ Victim K- The stress they keep me under and everything and in not taking chances of another miscarriage
- ➢ Cannada- Ok
- ➢ Victim K- OK
- ➢ Victim K- My boobs have white at the tip of them

---

[1] I made redactions to the messages as needed to protect victim privacy but did not make any other corrections.

> ➢ Cannada- Really

04-26-21, starting at 22:04
> ➢ Victim K- I want you in me baby
> ➢ Cannada- I want to be
> ➢ Victim K-why aren't you
> ➢ Cannada-Your're there and I'm here
> ➢ Victim K- you could come climb in bed with me and give it to me
> ➢ Cannada- ok Like that can happen

04-27-21, starting at 09:52
> ➢ Cannada- her and her sh*** causes us to lose another she best run because [Victim K's father] ain't going to be able to save her
> ➢ Victim K- yea
> ➢ Victim K- we have tried multiple times and we've done lost 2 or 3
> ➢ Cannada- i know
> ➢ Victim K- it's really aggravating she wont stop with her shit and stop causing us to lose another.
> ➢ C - I know
> ➢ Victim K- Me too

May 13, 2021, starting at 00:00
> ➢ Victim K- I want you
> ➢ Cannada- come get it
> ➢ Victim K- I might when everyone asleep
> ➢ Cannada- Promise
> ➢ Victim K- yes baby
> ➢ Cannada- put shorts on now then
> ➢ Victim K- I will when I get warm so about 5 min
> ➢ Cannada- You may have to wake me
> ➢ Victim K- Ok i will cause i want you in me
> ➢ Victim K- I just want o be sleeping with you in me
> ➢ Cannada- Ok you better

5-13-2021, starting at 21 :56
> ➢ Victim K- I said you have my room all to you
> ➢ Victim K- But thats if you don't want raped with rotten pussy
> ➢ Cannada-shit my car
> ➢ Cannada- Dick hurt a little from you
> ➢ Victim K- lol she jealous of me and you and my body and how I look
> ➢ Cannada- yea
> ➢ Victim K- and how i get looks from other
> ➢ Cannada- Read what i sent
> ➢ Victim K- Sorry about that poor dick
> ➢ Victim K- Do i need to kiss it so it will feel better

20

07-09-2021, starting 15:15
- ➢ Victim K- I thought we had a miscarriage
- ➢ Cannada- When
- ➢ Victim K- Yesterday from all the stress
- ➢ Cannada- well you see we didn't so stop
- ➢ Victim K- I know thats why i was freaking out

07-16-2021, starting at 21 :29
- ➢ Cannada- you need to talk to him about us getting married [redacted]
- ➢ Victim K- I've been talking
- ➢ Victim K- Still no luck but i'm not giving up
- ➢ Cannada- and
- ➢ Cannada- we need to let him know playing hes the on that said that you can get married whenever you turn 14 now you want to
- ➢ Victim K- I have but it feels like he want to deny it until the baby is born so he can keep it until we get our license

7-20-21, starting at 23:56
- ➢ Cannada- I want one of you head to toe with nothing on an done of you sideways showing me my baby
- ➢ Victim K- Ok let dad doze off a little bit more
- ➢ Cannada- Now
- ➢ Victim K- Baby I want you bad enough and our making me do that
- ➢ Cannada- yep
- ➢ Victim K- You better be glad i fucking love you
- ➢ [Verbatim messages unavailable: At 00:18 on 7-21-21, Victim K sent a picture of a vagina to Cannada.[2] At 00:33, Victim K sent a fully nude picture to Cannada, after which Cannada told her to move her hand. At 00:37, Victim K sent another fully nude picture to Cannada with her hand moved from the previous picture. At 00:45, Cannada sent Victim K a picture of his penis.]

07-22-2021, starting at 11:48
- ➢ Cannada- Because im not made to think that way i have a dick and thats the way it is
- ➢ Victim K- yes i know you have a dick, a big one at that
- ➢ Cannada- Big my ass
- ➢ Victim K- it is
- ➢ Cannada- ok how would you know
- ➢ Victim K- Every time i get up from the bed i end up hurting cause i'm stretched to pieces cause of it
- ➢ Victim K- and it feels even bigger when it's hard

---

[2] Detective Patterson noted that this was the picture that Victim K claimed to get from the internet.

- ➢ Cannada- ok
- ➢ Cannada- well
- ➢ Victim K- ok so we've came to an agreement that you have a big dick
- ➢ Cannada- no
- ➢ Victim K- why
- ➢ Victim K- and the fact you don't suck in bed
- ➢ Cannada- ok you shit
- ➢ Victim K- its true you don't
- ➢ Victim K- you get deep when you cum and its amazing
- ➢ Cannada- shut up

07-26-21 at 21 :40
- ➢ [Verbatim messages unavailable: Victim K sent a fully nude picture to Cannada.]

07-27-21, starting at 21 :03
- ➢ Victim K- it would be nice to go back to the moment i first climbed in your baby
- ➢ Cannada- Why
- ➢ Victim K- idk i just do
- ➢ Cannada- but why
- ➢ Cannada- you think you messed up
- ➢ Victim K- no baby
- ➢ Cannada- then y
- ➢ Victim K- i was the one that told you i wanted a baby
- ➢ Victim K- just to feel that moment when i knew i was yours and you were mine
- ➢ Victim K- Baby I remember the exact moment and where we were and what we were doing when i told you i wanted you to be the father of my baby
- ➢ Cannada- ok when and where
- ➢ Victim K- we were in my bed making sweet love 8 months into our relationship it was Nov 15 when i told you right before you cum in me I wanted a baby
- ➢ Cannada- I remember
- ➢ Victim K- me too i remember alot thats went on in our relationship
- ➢ Cannada- yea
- ➢ Victim K- yea
- ➢ Cannada- all good or bad
- ➢ Victim K- all good
- ➢ Cannada- ok
- ➢ Victim K- ok
- ➢ Victim K- I knew we were gonna be together forever the day I kissed you
- ➢ Cannada- REally im getting in the shower tell dad ill call him back
- ➢ Victim K- yes really but ok
- ➢ Cannada- How
- ➢ Victim K- The way i kissed you i knew you were the one i wanted to lose my virginity too and have one last chance at love with
- ➢ Victim K- I might be young but age is a number
- ➢ Cannada- True

22

> ➤ Victim K- Ok i wanted some one loyal that wouldn't cheat and break me
> ➤ K - I chose you
> ➤ Cannada- why me
> ➤ Victim K- Cause I wanted something true

07-28-2021, starting at 20:40
> ➤ [Verbatim messages unavailable: Victim K sent two fully nude pictures of herself to Cannada. At 22:48, Cannada sent Victim K a picture of his penis. At 22:58, Victim K sent Cannada two more fully nude pictures.]

07-30-2021 at 20:24
> ➤ [Verbatim messages unavailable: Victim K sent Cannada two fully nude pictures of herself.]

28.    In examining the messages, Detective Patterson made note of the telephone numbers associated with the messages—Cannada's number being (606) 416-4046 and Victim K's number being (606) 492-4174. Detective Patterson also ascertained that Cricket provided the phone service for Victim K's phone.

29.    On August 11, 2021, Victim K's mother advised Detective Patterson that Victim K was continuing to communicate with Cannada via Facebook messenger.

30.    On August 12, 2021, as Detective Patterson prepared a search warrant to forensically extract and examine the data on Victim K's phone, Detective Patterson learned that the phone had been remotely reset. Detective Patterson nevertheless completed and submitted the search warrant for the phone. The Kentucky Attorney General's Office ("KYOAG") later advised that the phone and been wiped and that no data could be recovered using the forensic tools available at that time.

31.    On that day, Detective Patterson also completed a search warrant to Cricket Wireless for records relating to (606) 416-4046 and (606) 492-4174 and a search warrant to Facebook for Cannada and Victim K's accounts.

32.     Also on that day, Victim K's parents provided Detective Patterson with a PayPal debit card that Cannada had given to Victim K so that she would have money.

33.     On August 13, 2021, Cricket Wireless returned records for (606) 416-4046 and (606) 492-4174. Both numbers were prepaid and registered to Jonathan Cannada. The SMS message logs for each telephone number were hundreds of pages long with thousands of text messages between Cannada's number and Victim K's number occurring between March 25, 2021, and August 3, 2021. The records reflect text and images being exchanged but did not reflect the content of either type of message. Detective Patterson compared the time stamps of the text and MMS messages from the Cricket Wireless records to the notations in his investigative report, and the dates and times corresponded with one another.[3]

34.     The Cricket Wireless records show that the account holder reported each phone associated with the aforementioned numbers stolen on August 7, 2021.

35.     On September 9, 2021, Detective Patterson received the Facebook records requested in his August search warrant. In reviewing Cannada's records, Detective Patterson learned that Cannada communicated with Victim K through her own Facebook account but also through Cannada's daughter's Facebook account (hereafter, "J's Facebook").

36.     The relevant portions of the Facebook records are too voluminous to be included verbatim here. Many of the messages discuss Cannada and Victim K's romantic relationship, their past sexual encounters, future or desired sexual encounters, the pregnancy, and SPD's criminal investigation. For example, on March 6, 2021, Cannada tells Victim K to bring panty liners with her and Victim K eventually responds that a panty liner cannot hold all of Cannada's

---

[3] The Cricket records were in UTC but corresponded with Detective Patterson's records when adjusted to EST.

cum. As another example, on May 7, 2021, Victim K states "my p*ssy is still wet from us earlier," and Cannada asked if he stretched it.

37.    The conversations also included Cannada requesting and receiving sexually explicit visual depictions of Victim K.   The Facebook records include some of the sexually explicit visual depictions. For example, on August 11, 2021, Cannada messaged J's Facebook account: "May i still have a picture please" and the records show that Victim K provided a fully nude picture of herself. However, some of the sexually explicit pictures were unsent by Victim K after viewing by Cannada and were therefore unavailable for viewing in the records. For example:

<u>8-11-21</u>
- ➢ Cannada- My pic please I
- ➢ Victim K- Here you go
- ➢ [Picture unsent.] Buttercup unsent a message.
- ➢ Cannada- - other side please
- ➢ Victim K- wdym
- ➢ Victim K- front
- ➢ Cannada- Right side please
- ➢ Victim K- Ok
- ➢ Cannada- front would be nice too
- ➢ Victim K-  Don't mind my face
- ➢ [Picture unsent.] Buttercup unsent a message.
- ➢ Victim K-  I was confused
- ➢ Cannada- Its my face
- ➢ Victim K-  ok
- ➢ Cannada- Front?
- ➢ Victim K- yes
- ➢ Cannada- I ate binner tonight now I feel sick
- ➢ [Picture unsent.] Buttercup unsent a message.
- ➢ Victim K- I sorry
- ➢ Cannada- Absolutely stunningly beautiful
- ➢ Cannada- I need you to send me a G-rated after you get out of shower for Denise
- ➢ Cannada- Your Breath taking buttercup

38.    The Facebook records also contain evidence that Cannada and Victim K attempted to conceal certain evidence from Victim K's parents and law enforcement, including discussions of deleting messages:

08/10/2021:
➢ Victim K- Imma try to search they room harder for my phone
➢ Cannada- I'll have to reactivate it
➢ Victim K- I know
➢ Cannada- and it'll have to be logged back into your google because the phone was blanked
➢ Victim K- ok good cause it had all our nude pics and them m~ mom rubbed it in she seen a picture of your dick
➢ Cannada- they was only in our message right
➢ Victim K- Yea
➢ Cannada- Well find it and delete the message if it's not been blanked
➢ Victim K- I will
➢ Victim K- I'm like well it's been in me more times than you've seen it and its mine so back off
➢ Victim K- it was funny
➢ Cannada- what did she say
➢ Victim K- She tired telling me it wasn't mine
➢ […]
➢ Victim K- But I'm not doing that I wanted this child
➢ Cannada- we want this child
➢ Victim K- I know baby
➢ Cannada- All I wanted to do when the detective said you don't want me or the baby I wanted to choke him
➢ Cannada- NO worries, I'll get his ass
➢ Cannada- They cant get me for anything with you remember that
➢ Victim K- I know that
➢ Cannada- All they can prove is that we had a consensual relationship with your
➢ Cannada- your mothers approval
➢ Cannada- Did you tell the detective everything from the start
➢ Victim K- I know but now they have my phone and nothing as deleted or erased
➢ Victim K- I didn't get the chance but that woman knows
➢ Victim K- our nude and everything was on there
➢ Cannada- So the bones in my name
➢ Cannada- Unless you mom tried to lie and say it's in her name but it's not it's mine
➢ Victim K- oh he knows it's in your name
➢ Cannada- The he knows there's nothing he can do
➢ Victim K- I told him when i sent a picture of my p***y to you I said from the internet

➢ Victim K- But we both know its mine
➢ Cannada-Okay what did he have to say to that
➢ Victim K- he said ok and asked id
➢ Cannada- Did you tell them all if they cause you to have a miscarriage I will kill the whole F****** town off to get the right one
➢ Victim K-yea
➢ Cannada- He asked if what
➢ Cannada- What did he have to say about what you said if you have a miscarriage what was going to happen
➢ Victim K- It was forced for me too send nudes to you
➢ Cannada- Okay what did you tell him on that one
➢ Victim K- H didn't say anything he looked scared
➢ K - I told him no I wasn't
➢ Cannada- Okay the what did 11ehave to say
➢ Cannada- So other words you're telling me he know he ain't got a case and that's the way that it is
➢ Victim K- Yea

39.    On September 20, 2021, Victim K's mother reported to Detective Patterson that Cannada sent her threatening messages, including threats to do bodily harm, such as: "somerset isn't going to save you…," "when I have your hair in my hand I will deide what the f*** I'm going to do with you…," "Please keep f****** around and so help me God when I got you here in my hand I will decide what I'm going to do with you…," and "I'll put it through his head and then yours Two Shots One Kill Ya that's my method."

40.    Detective Patterson then went to the Lincoln County Attorney's Office and filed a Criminal Complaint against Cannada for retaliating against a participant in the legal process. A judge signed the arrest warrant on September 22, 2021, and Detective Patterson began the process to extradite Cannada. At the time of his arrest, Minneapolis Police Department found Cannada to be in possession of a switch blade and later learned that he had a handgun in his hotel room. Following his arrest, Cannada was housed at the Anoka County Jail.

27

41.     On October 18, 2021, the Anoka County Sheriff's Department advised Detective Patterson that Cannada's monitored communications included an admission that he was having a relationship with a fourteen-year-old girl. The subject messages came from account associated with four different emails: *****cannada518@gmail.com, *****cannada205@gmail.com, *****cannada@gmail.com, and hellschildlady@gmail.com. Detective Patterson's review of the messages led him to believe that the messages were communications between Cannada and Victim K. The messages include discussions of the baby and affirmations of love. In the messages, Victim K tells Cannada that she is going to tell a lie about her mother in an upcoming interview to get her mother in trouble.

42.     Victim K appeared for a forensic interview on October 19, 2021. Victim K continued to minimize her interactions with Cannada, claiming they had sex only once and that they were not in a relationship. In speaking with Detective Patterson after the forensic interview, Victim K denied any recent contact with Cannada and denied sending him nude images of herself over Facebook.

43.     On November 2, 2021, a grand jury in Pulaski County returned an indictment against Cannada for five counts of second-degree rape, tampering with physical evidence, and persistent felony offender. By this point, Cannada had been released from custody in Minnesota and, following the indictment, Blaine Police Department in Minnesota re-arrested Cannada without incident. Blaine Police Department seized two phones, a Samsung Galaxy and an LG, during Cannada's arrest and sent them to Somerset Police Department.

44.     On November 12, 2021, a grand jury in Lincoln County returned an indictment against Cannada.

45.     On November 16, 2021, Detective Patterson obtained search warrants for Cannada's two phones and sent the phones to the KYOAG for examination.

46.     In December 2021, Victim K gave birth. Detective Patterson obtained a search warrant for the infant's DNA and obtained said DNA via buccal swab. In January 2022, Detective Patterson obtained a search warrant for Cannada's DNA and again obtained said DNA via buccal swab. KSP later determined Cannada to be the biological father of Victim K's baby.

47.     The KYOAG returned the results of their examination of Cannada's phones to Detective Patterson in January 2022. Using the then-available forensic tools, the KYOAG performed "file system" extractions of the phones—which provides some but not all data on a device.

48.     According to Detective Patterson's review, the Samsung Galaxy contained approximately 168 nude images of Victim K with her face visible. The LG contained approximately 36 images of Victim K nude, posing in underwear, or in a bed covered with a sheet. Two images show Victim K performing oral sex on an adult male penis.

49.     On January 15, 2022, Cannada returned to Kentucky via extradition and arrived at Pulaski County Detention Center.

50.     Through much of 2022, Victim K and Cannada continued to communicate—using Cannada's friends as intermediaries and using a mobile application, Ameelio, that allows users to send mail to an inmate from a smart phone. Detective Patterson obtained a search warrant to collect copies of the Cannada's incoming and outgoing letters from Pulaski County Detention Center. In the fourteen incoming letters from Victim K, she professes her love for Cannada and says that she is trying to get him out of jail. The two outgoing letters were addressed to Victim K

but were sent to the address of Cannada's friend in Minnesota, William Lanham also known as "Billy Martin."

51.     On December 5, 2022, Detective Patterson obtained a search warrant for the Facebook records of Jonathan Cannada, J's Facebook Account, Victim K, Hell Child's Place, and William Lanham. Through these records, Detective Patterson learned that the nude images of Victim K sent from J's Facebook Account between August and September 2021 contained an IP address of 12.233.212.226. Detective Patterson attempted to obtain subscriber information for that IP address but the service provider no longer maintained the records. This newest set of Facebook records showed Victim K attempting to communicate with Cannada through William Lanham and Tiffany Wheeler through most of the year 2022.

52.     On January 18, 2023, Detective Patterson interviewed Tiffany Wheeler. Wheeler advised that she lacked knowledge of Victim K's real age when she agreed to forward communications from Cannada to Victim K. Wheeler reported that he stopped acting as an intermediary when she learned of Victim K's true age.

53.     In late January 2023, Assistant United States Attorney Mary Melton and I met with SPD to discuss the possibility of federal charges against Cannada. During that meeting, Detective Patterson displayed a picture of Cannada and I recognized him from an incident at University of Kentucky Hospital ("UK Hospital") involving a report that Cannada was interacting with a minor female in a manner that made the hospital staff uncomfortable.

54.     In early February 2023, FBI opened a case on Cannada relating to his online conduct with Victim K.

30

55. On February 24, 2023, FBI held separate meetings with Victim K and Victim A1. During the meeting with Victim K and her family, Victim K's mother advised that another young female, Victim C, previously discussed an incident involving Cannada at UK Hospital.

56. During the meeting with Victim A1 and her mother, Victim A1 reported that Cannada often sexually assaulted her when she was sleeping. Victim A1 advised that she was not certain if Cannada created sexually explicit images of her, but she thought that he might have. She elaborated that Cannada showed Victim A1 a picture of another minor female, Victim A2, sleeping with her pajamas pulled down, showing Victim A2's genitals. Victim A1 reported that Cannada showed her the picture on his Samsung when Victim A1 was seven or eight years old.

57. Victim A1 also reported that Cannada gave her a secret phone with which to communicate with him. Victim A1 said that Cannada would "sext" her using the secret phone and that he asked her to send sexually explicit images of herself. Victim A1 advised that she was too shy and embarrassed to actually create the images, but he often asked. Victim A1 said a typical request would involve Cannada sending Victim A1 a picture of his penis and asking her to send a picture "like that." Victim A1 reported that these interactions occurred approximately when she was in fifth grade.

58. When asked if Victim A1 still had the secret phone, Witness 1 said the phone had been destroyed. Witness 1 said that she found the phone and confronted Cannada about it, throwing the phone on the concrete during the confrontation.

59. Victim A1 said that she did not believe that the Google account on the secret phone belonged to her. She said she thought Cannada's Google account was on the phone. She advised that his Google account was his name followed by some numbers, possibly a year. She advised that his password involved her name.

31

60.    Before Witness 1's relationship with Cannada soured, she reported being at his apartment and seeing multiple phones. She said that Cannada, fearing eviction, once even specifically asked Witness 1 to remove the phones. Witness 1 advised that she did not remove the phones because she did not want to go into his apartment because it was filthy.

61.    Victim A1 also recalled Cannada having multiple phones, advising that he had at least three phones at his father's house.

62.    Victim A1 also offered information about Victim C and Victim C's younger sister. Victim A1 said that Cannada frequently babysat Victim C and her sister. Victim A1 believes that Cannada sexually abused Victim C because she recalled Cannada asking Victim A1 is she minded sharing him with Victim C.

63.    On March 22, 2023, Victim K sat for a second forensic interview to more specifically discuss the pictures of her found on Cannada's phone.

64.    Victim K said that she has known Cannada for three or four years. After she met him, they started "hanging out." Cannada taught Victim K about vehicles and frequently allowed Victim K to work with him at a garage. Victim K said she enjoyed Cannada teaching her things. Victim K further elaborated that Cannada served as a father figure to her during a time when she thought her real father, who is older and suffers poor health, was going to die. Victim K said that Cannada stayed at her family's home, but sometimes left when he was mad.

65.    Victim K reported that Cannada thought he was "big and bad" and often talked about doing violent things to people.

66.    Victim K said that Cannada started manipulating her after her grandfather passed away in December 2020 or about two years ago. Victim K said she did not notice the change to manipulative behavior at the time.

32

67.    Victim K described the "first time" that Cannada raped her. A few days after Victim K's grandfather died in December 2020, Victim K and Cannada had plans for Cannada to pick up Victim K in the morning so that she could work with him. The night before, Cannada got "drunk." Victim K recalled being on the phone with Cannada from 2AM to 6AM and believes Cannada hit a mailbox when driving home. Victim K later went to Cannada's house to wake him up. She said the next thing she remembers was her clothes being off. She says the time in between trying to wake Cannada up and her having her clothes off is "blocked out." Victim K advised that some of the blocking out is memory related and some of it relates to her not wanting to talk about it. Victim K said that, when she woke up with no clothes on, she was hot and sweaty like she had a nightmare. She assumes that she and Cannada had sex because she got pregnant.

68.    Victim K then elaborated about Cannada manipulating her by threatening to kill himself. Victim K said she sent Cannada pictures to save his life.

69.    Victim K said that she took the pictures at her house in Crab Orchard, Kentucky (in Lincoln County) and later at her sister's house in Pulaski County. Cannada told her what to send in the pictures, and he mostly wanted to see her "part down there."

70.    Victim K described using a secret phone that Cannada had given her to take the pictures. She then added that Cannada had actually given her two phones, one of which broke (and the other is in law enforcement custody). Both secret phones were android devices. Victim K also recalled there possibly being photos on her iPhone 6s. The photos were primarily sent via Facebook Messenger. Victim K reported that she frequently unsent the explicit photos on Facebook Messenger after Cannada saw them, because she did not want other people to see them.

33

71.      Victim K said that she was twelve or thirteen years old when she first sent pictures and thirteen or fourteen when she last sent pictures. Cannada requested four of five photos every day or every other day.

72.      In addition to pictures, Victim K disclosed that she may have taken a couple of videos of her touching herself "down there." She also said that she and Cannada had engaged in explicit video calls once or twice. In the video calls, Victim K masturbated while in her Lincoln County home and Cannada masturbated while in Minnesota.

73.      Victim K reported that Cannada also sent pictures of his "down there" every night or every other night, sending pictures both from his dad's house and from his home in Minnesota after he moved.

74.      The forensic interviewer showed Victim K three pictures of vaginal or oral intercourse. Victim K identifies herself in all three pictures but said she did not remember the photos being taken.

75.      The forensic interviewer also showed Victim K three pictures showing female genitalia. Victim K identified herself and her home in Lincoln County but did not want to discuss the images further.

76.      Victim K said that she told the first forensic interviewer that sex with Cannada was consensual because Cannada was still manipulating her. Despite evidence to the contrary, Victim K remained steadfast that there was only one instance of sexual intercourse and that she stopped communicating with Cannada when she was told to do so.[4]

---

[4] I believe Victim K fears that she will get in trouble or disappoint authority figures if she deviates from her previous statements about these topics.

77.     Based on the aforementioned facts, I submit that probable cause supports that Cannada produced child pornography of Victim K; enticed Victim K to engage in prohibited sexual activity; received child pornography of Victim K; transferred obscene material to Victim K; attempted to produce child pornography of Victim A1; and produced child pornography of Victim A2.

78.     This conduct involved interstate or foreign commerce for the following reasons. First, the Devices, which I believe were used to create the sexually explicit visual depictions of Victim K, were manufactured outside of Kentucky. Second, Cannada used Facebook Messenger, which operates via the internet (a means or facility of interstate or foreign commerce) to entice Victim K to create and send sexually explicit visual depictions of herself and to also transfer obscene material to Victim K. Third, if Cannada had been successful in his efforts to obtain sexually explicit visual depictions of Victim A1, she would have created and transmitted the images with the smartphone that Cannada provided to her, which also would have contained materials that were shipped in interstate commerce. Finally, Cannada showed Victim A1 a sexually explicit visual depiction of Victim A2 on his Samsung phone, a company without manufacturing operations in Kentucky.

79.     Following the adoption of the case, I consulted with Detective Eric Long, investigator and forensic examiner at the KYOAG. Detective Long advised that the forensic tools have improved since the Devices were examined in 2021 and that it may be possible to pull more data if the extractions and examinations were re-performed. Specifically, Victim K's phone—from which no data could previously be extracted—could now compatible with "physical" imaging, which allows forensic examiners to review more deleted data in the unallocated space of a device. This may allow for the recovery of the data that Detective

35

Patterson reviewed before the phone was remotely wiped as well as other pictures and messages deleted by Victim K at Cannada's direction. Cannada's phones are also now supported for "physical" imaging. The possible recovery of deleted data from Cannada's devices may reveal additional evidence—including pictures, videos, or messages—relating to Victim A1, Victim K, and the other possible victims discussed above.

80.     The Devices are currently in the lawful possession of the KYOAG.  As discussed above, the devices came into the KYOAG's possession following search warrants from SPD. Therefore, while the KYOAG might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

81.     The Devices are currently in storage at the KYOAG Cyber Crime evidence locker at 1024 Capital Center Drive, Frankfort, KY 40601.  In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the KYOAG.

## **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

82.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Devices, in whatever form they are found.  One form in which the records might be found is data stored on a smartphone's storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

83.     *Probable cause.*  I submit there is reason to believe the records listed in Attachment B will be stored on the Devices for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer/smartphone[5] files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer or smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet / cellular connection are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      There are different types of extraction available to forensic examiners depending on the tools available to them and the type of device being examined. Some types of extraction are more comprehensive than others. While some types of extractions only provide data that was viewable by the device's user, other types of extraction allow an examiner to view deleted data, file remants, and system data. A physical extraction is the most comprehensive.

f.      Forensic tools used to extract data are constantly improving. The Devices at issue here were not compatible with a physical extraction in 2021, but may be compatible with a physical extraction now.

84.      *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronic files or data that might serve as direct evidence of the

crimes described in the warrant, but also for forensic electronic evidence that establishes how

---

[5] Because a smartphone is, in part, a handheld computer, this portion of the affidavit will use the terms "computer" and "smartphone" interchangeably.

computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the Devices because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified for nefarious reasons by a subject.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may

38

either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

85.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

86.    *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

87.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Stanley Williams, Jr.
Stanley Williams Jr, Task Force Officer
Federal Bureau of Investigation

Transmitted by email and attested to by telephone in accordance with the requirements of Fed. R. Crim. P. on April 27, 2023.

Hon. Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE